## SUTTER BUTTE CANAL COMPANY *v.* RAILROAD COMMISSION OF CALIFORNIA.

No. 403. Argued March 6, 7, 1929.—Decided April 8, 1929.

*Mr. Isaac Frohman,* with whom *Mr. Douglas Brook-man* was on the brief, for plaintiff in error.

*Messrs. Arthur T. George* and *Carl I. Wheat* were on the brief for defendant in error.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This is a writ of error to an order of the Supreme Court of California reviewing on certiorari an order of the Railroad Commission of the State fixing water rates and contracts. 202 Cal. 179. The Sutter Butte Canal Company, a corporation of the State, petitioned for a review and the annulment of an order of the Railroad Commission designated as decision No. 16289, made on March 20, 1926, relating to water rates, the valuation of its property for rate-fixing purposes, the rate of return thereon and the modification and practical abrogation of certain continuous contracts for the furnishing of water held by it with a certain class of consumers.

The history of the Company as a public utility engaged in the business of appropriating water from the Feather River and selling and distributing it for irrigation purposes in Butte and Sutter counties, is set forth in *Butte County Water Users Association* v. *Railroad Commission,*

185 Cal. 218: *King* v *Railroad Commission*, 190 Cal. 321, and *Live Oak Water Users Association* v. *Railroad Commission*, 192 Cal. 132, s. c. 269 U. S. 354.

The Canal Company is a public utility subjected by law to the power and direction of the State Railroad Commission and is in possession of a water right dedicated to the public use. Its consumers are divided into two classes—contract consumers and non-contract consumers. The water was originally furnished to the contract consumers under water right contracts which were continuous supply contracts, whereby the consumer paid an initial amount, which varied somewhat, and agreed to pay a stipulated rate for irrigation water service each year thereafter upon the total acreage covered by the contract, and the Company on its part agreed to furnish water as required for all of the acres covered thereby. Non-contract consumers, or applicants, pursuant to the order of the Commission made in March, 1918, were served upon the basis only of applications for water made from year to year.

In December, 1924, a decision, numbered 14422, on application by the Company, further increased the water rates over those allowed under a decision of 1922, and abolished the differential in rates which had theretofore existed between contract and non-contract consumers. It created what was called a stand-by or service charge, of $1.25 per acre, payable by both classes, effective as to non-contract holders for all of their lands covered by their applications during such time as they should continue thereunder, and in any event for not less than three years, and to be continuously effective as to contract holders for all of the lands covered by their contracts; provided that if such contract holder did not desire to use in any year the whole or any part of said water to which he was entitled, and filed with the Company on or before February 1st of that year notice in writing of what he did not desire in respect to the service of the water, he should then

be obligated to pay in that year, and in each year here-after, on or before February 1st thereof, the service charge of $1.25 per acre of the land for which no water was desired, as specified in the notice, and as to the remainder of his land he was to pay such rates or charges based upon the extent and character of the use of the water which he desired to use as were in effect.

This, however, was not a satisfactory adjustment, as the Commission ultimately determined, and in 1925 there was a completely new investigation by the Commission of the rates, charges, classifications, contracts, rules, regulations and service of the Canal Company, in view of existing protests and dissatisfaction. This led to a hearing of all parties in interest covering the main question as to the jurisdiction of the Commission, under the California law, to modify the obligations of the parties, not only by use of the rates, but by direct variation of the terms between the Canal Company and the owners of so-called continuous contracts; and also to a consideration of the fairness and equity of the rates to be fixed for the payment for water furnished by both contract and non-contract users, and other details involved in a broad investigation.

The proceedings resulting in decision No. 16289, modified the previous rules so as to give each continuous contract holder the right, at his option, either (1) to obtain water under applications for so much of his land as he desired to irrigate, similarly with applicants generally who were not holders of continuous contracts, or (2) to obtain water under his continuous contract, provided that if he so elected, he might still, by notifying petitioner that he did not desire to use in any year the whole or any of the water which he was so entitled to receive, and filing with the Company on or before February 1st of that year notice in writing of what he did desire in respect to the non-service of water, be obligated in that year, and in the next succeeding year thereafter, but for no further period in

which said notice remained in effect, to pay, on or before February 1st thereof, the service charge of $1.25 per acre of the land for which no water was desired, as specified in said notice; or (3) to release himself from any obligation to pay any charges to petitioner under his continuous contract by giving notice that he did not desire any water for his land in any year, or to give notice or use the water.

The substance of this was to release all contract consumers. The contracts might be retained at the election of the consumer, but the whole plan was really to get rid of the troublesome dual situation and to abolish all distinction between the two classes of consumers and put them on a parity, in order that there might be removed from controversy this source of friction and trouble. The Commission said:

" Rates fixed herein will, therefore, be on the basis that all service be charged for under a uniform schedule of rates and under application forms which will exclude any consideration of the continuous contract and preclude the making of charges for unirrigated lands under such contracts, as such."

In view of the finding of the Supreme Court that the record does not disclose any substantial evidence which would impeach the findings of the Railroad Commission upon the subject of a fair rate-base and a proper return to the Company, with which we agree, our decision will be limited to a consideration of the charge that the decision here under review is a violation of the Fourteenth Amendment by taking away from the Company its contract rights and depriving it of payment to it for water service for all the lands which under the original contract the land owners were to pay for, whether the water was used or not.

The case made on behalf of the Commission and its decision is that there has been delegated by the State to the Commission the regulation for the public benefit of the

rates and revenue to be received by the public utility for the service it renders to, the public; that included in such power of regulation is the modification and qualification of the original contracts held by the public utility corporation in this public service; that in being a public utility under the California Constitution it necessarily submits itself to the police power of the State for the benefit of the public; that the ordinary rules that apply to the protection of contracts as between private persons under the Constitution of the United States, or to the maintenance of due process of law under the Fourteenth Amendment and the rights of property as between individuals, do not apply, but that, by the acquisition of such contracts and property, knowing that the police power controls in their regulation, the owner holds them without the usual sanctions of the Fourteenth Amendment of the Federal Constitution between individuals. This power is said to operate upon property and property rights, including contracts, to the extent necessary for the protection of the public health, safety, morals and welfare, and its exercise has been committed to the Railroad Commission in regulating the public utilities in California.

The State Constitution of 1879, Article 14, § 1, provides:

" The use of all water now appropriated, or that may hereafter be appropriated, for sale, rental, or distribution, is hereby declared to be a public use, and subject to the regulation and control of the State, in the manner to be prescribed by law. . . ."

Article 12, by § 23, an amendment added in 1911, provides:

" Every private corporation, and every individual or association of individuals, owning, operating, managing or controlling any . . . canal, pipe-line, plant or equipment, or any part of such . . . canal, pipe-line, plant or equipment within this state, . . . for the production, generation, transmission, delivery or furnishing of heat, light,

water or power . . . to or for the public . . . is hereby declared to be a public utility subject to such control and regulation by the Railroad Commission as may be provided by the legislature, and every class of private corporations, individuals, or associations of individuals hereafter declared by the legislature to be public utilities, shall likewise be subject to such control and regulation. The Railroad Commission shall have and exercise such power and jurisdiction to supervise and regulate public utilities in the State of California, and to fix the rates to be charged for commodities furnished, or services rendered by public utilities as shall be conferred upon it by the legislature, and the right of the legislature to confer powers upon the Railroad Commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this Constitution."

Section 67 of the Public Utilities Act, enacted in 1911, provides that the exercise of the power thus conferred upon the Railroad Commission is to be reviewed only by the Supreme Court, to determine whether the Commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of the State of California. The findings and conclusions of the Commission on questions of fact shall be final and shall not be subject to review. Such questions of fact shall include ultimate facts and the findings and conclusions of the Commission on reasonableness and discrimination. The Commission and each party to the action or proceeding before the Commission shall have the right to appear in the review proceeding, and upon the hearing the Supreme Court shall render judgment either affirming or setting aside the order or decision of the Commission. (Deering's Gen. Laws of 1923, p. 2734.)

Without now affirming or denying all that is claimed for them, we think that the above recited clauses from the constitution and statute are sufficient to subject the contracts in question to the regulating action of the Commission upheld by the decision under review.

The power to increase charges for service had been twice exercised by the Railroad Commission at the behest of the Canal Company, and the times and terms of payment under the contracts had been changed by the same power, and so far as the petitioner was concerned, its privileges and emoluments under the contract had been greatly increased. So far as the consumer was concerned, the contract has slight, if any, benefit to him left in it. The consumer of water who came in last, and who had no contract, was really served with water upon less onerous terms than the contract consumer, and he might satisfy all demands made against him in three years, if not sooner, and be completely released. This the Supreme Court held was a discrimination. It decided that it was within the power of the Commission to remove it. The only provision of the contract which had not been theretofore modified by the Commission or the Court was the one with respect to the duration of the contract. As the contract was necessarily made in view of the power of the Commission to change its terms, to avoid discrimination in dealing with the consumers of water of a public utility, it is very difficult to see why the situation may not be reduced to a uniform one under the power of the Commission, if that body deems it equitable and fair to do so in the interest of the public. The record shows with much clearness the complicated situation that must continue unless the duration of the obligations of the so-called contract and non-contract consumers be made the same. This change would seem to be well within the police power, subject to which these contracts were made, and there is no such difference between the fixing of rates

and the modification of the duration of a contract as would prevent the application of the police power to the one and not to the other. There are a number of authorities that leave no doubt that such an exercise of the police power under the Constitution of 1879 must be sustained. *Limoneira Co. v. Railroad Commission,* 174 Cal. 232, 237; *Law v. Railroad Commission,* 184 Cal. 737, 740; *In re Murray,* 2 Cal. R. R. Comm. Dec. 465, 494; *Sausalito v. Marin Water Co.,* 8 Cal. R. R. Comm. Dec. 252, 261. The same question was before the Supreme Court of the State of Washington in the case of *Raymond Lumber Co v. Raymond Light & Water Co.,* 92 Wash. 330. The power of the Commission to abrogate the contract between a utility and its consumers was upheld. An admirable statement of the principle is to be found in *Re Guilford Water Co.'s Service Rates,* 118 Me. 367. The general principle supporting such an exercise of the police power under the Fourteenth Amendment is sustained in *Louisville & Nashville Railroad Co. v. Motley,* 219 U. S. 467. In this case it was held that the power of Congress to regulate commerce among the States, which is analogous to the police power of the States in regulating public utilities, extended to rendering impossible enforcement of contracts made between carriers and shippers, although valid when made, because they were all made subject to the possibility that, even if valid when made, Congress might, by exercising its power, render them invalid. That is exactly the situation presented here. Those who made these contracts for water made them subject to the power of the Commission to change them for the benefit of the public, and that is all that has been done in this case by the Commission's order. See also *Manigault v. Springs,* 199 U. S. 473, 480; *Hudson County Water Co. v. McCarter,* 209 U. S. 349, 357; *Chicago, B. & Q. R. R. Co. v. McGuire,* 219 U. S. 549, 567; *Atlantic Coast Line R. R. Co. v. Goldsboro,* 232 U. S. 548, 558; *Union Dry Goods Co. v. Georgia Corp.,* 248 U. S.

372, 375; *Producers' Transportation Co.* v. *Railroad Commission,* 251 U. S. 228, 232.

At the bar counsel for the appellant expressed some anxiety lest the Commission might not accept the interpretation put on the order in question by the Supreme Court of the State, and for that reason he asked that we interpret the order independently. But the decision of the Supreme Court of the State is conclusive on us as to the interpretation of the. order, that being a state question; and counsel for the Commission announced at the bar that the Commission regarded that decision as binding on them. Thus it is apparent that an independent interpretation by us of the Commission's order cannot and ought not to be attempted.

The judgment of the Supreme Court of California is

*Affirmed.*